Good morning and welcome to the United States Court of Appeals for the Third Circuit. We are glad to see all of you here today and we will be hearing one case on Banc, Range v. Attorney General number 21-2835. Counselor. Good morning Your Honors. May it please the Court. Pete Patterson for the appellant and I'd like to reserve five minutes of my time for rebuttal. That'll be granted. Under Bruin, Brian Range's non-dangerous misdemeanor offense cannot disqualify him from exercising Second Amendment rights. We begin with the plain text and the text of the Second Amendment protects a right of the people. Heller held that the people in the Second Amendment means all Americans just as it does in the First and Fourth Amendment context. Bruin reiterated that holding stating that the Second Amendment guaranteed to all Americans the right to bear commonly used arms in public subject to certain reasonable and well-defined exceptions. The exceptions are a matter of history not plain text and looking to history the government cannot show any tradition of disqualifying non-dangerous individuals from Second Amendment rights. This can in by the very examples cited by the panel decision in this case which all show that disarmament was predicated on danger. We can begin with laws disarming African-Americans. These racist laws should not form any basis for modern day legislation but nevertheless they were predicated on danger. We can see that in looking at Dred Scott. Bruin cited Dred Scott for the proposition that even that recognized that if African-Americans were citizens then it would follow that they had a right to carry firearms and Dred Scott explained what the consequence of that would be and that would be to endanger the peace and safety of the state. Laws disarming religious minorities are similar. Again these discriminatory laws should form no basis for modern day legislation and yet they were predicated on danger. The Virginia statute disarming Catholics during the Seven Years War for example stated whereas it is dangerous at this time to permit papists to be armed. Laws disarming loyalists during the American Revolution are similar. Now Heller or Bruin note 26 stated that wartime measures do not provide a great basis on which to interpret the Second Amendment but in any event these laws had twin aims predicated on danger. One to take arms away from those who could be dangerous to the American cause and to take those arms and give them to individuals who would fight for the American cause and we can see the predication on danger in Pennsylvania's oath statute. A 1779 supplement stated it is very improper and dangerous that persons disaffected to the liberty and independence of the state should possess firearms. Even the Pennsylvania Minority Report supports the danger line and I say convention proposals to interpret the Second Amendment but nevertheless the Minority Report said individuals could be disarmed for crimes committed and that raises the question which crimes? Well both Blackstone and Webster stated that crimes could mean offenses of a deeper and more atrocious nature and Webster defined atrocious as extremely heinous criminal or cruel enormous outrageous very grievous violent and it is apparent that the Minority Report is using crimes in this sense by the very next clause which is or for real danger of public injury and to the extent there is any ambiguity Bruin in footnote 11 makes clear that it must be interpreted in favor of the Second Amendment. The government's position in this case is fundamentally incompatible with Heller which held that the Second Amendment protects a fundamental individual right of self-defense of defense from public or private violence. It follows and is consistent with history that those who threaten public or private violence the very individuals the Second Amendment is meant to protect us from can be disqualified from the right but it does not follow that non-dangerous individuals can be disarmed. Indeed Heller rejected the notion that the Second Amendment protects a mere civic right like the right to vote and this distinction can be seen in history for at the founding it was commonplace for the basis of a criminal conviction but there were no laws disqualifying individuals from the right to keep and bear arms on the mere basis of a criminal conviction. I welcome the court's questions. All right if we were to agree with you that only dangerous and or violent felons can be constitutionally disarmed how do we determine who falls into that category? I didn't see in your brief that you proposed a standard or limiting principle to that effect. Yes your honor thank you for that question there as the dissent in the black car case says legislatures can use careful rules of thumb to identify inherently dangerous crimes which clearly would include crimes like murder that involve violence and then also crimes like residential burglary that are closely associated with violence and we can see this too again the Second Amendment Heller said is meant to be armed and ready in case of conflict with another person. Well what types of conflicts may engender an armed response? Blackstone at the founding said it was forcible and atrocious crimes so we look to those sorts of crimes again that would provoke the type of response very people the Second Amendment is meant to protect us against those people can be disqualified and to the extent there is any uncertainty or this line is not administrable it's the government's that this law is constitutional so danger is the standard it's the government must prove an administrable standard. Judge Sutton said in his Tyler concurrence we frequently have things that over protect prophylactic rules that over protect constitutional rights like Miranda warnings but it's unheard of to have prophylactic rules that under protect constitutional rights. All right thank you we'll turn to Judge Jordan. Morning thank you for your argument Mr. Manchin. I'm going to try to get a couple of questions in. The first is you started with the scope of the right and in her dissent and canter then Judge Barrett pointed out or that in her view we our court in Inderup had had begun with the question of who does the Second Amendment protect and she said that's a debate that's going on and and it's better to look at it not as who does the amendment cover because it should cover all people but look at it as what is the scope of the legislature's power to strip somebody of the right to bear arms. Now assuming she's right about what we said in Inderup my question to you is did we get it wrong did we did we start from the wrong place and does that have any practical effect here or should we worry that it has a practical effect in future cases? Yes I believe Judge Barrett's view now Justice Barrett's view is correct and that is because Bruin has clarified the standards and Bruin says you start with the plain text and the plain text says the people and there's nothing in the plain text as Heller said it's all Americans not some unspecified subset. So if that's true what is that what's the upshot of that? She also says probably doesn't make any difference gonna end up in the same place and a lot of a lot of times I'm trying to find out that is there any time where you won't end up in the same places it's just that like a kind of a semantic debate or is there real consequence to that analytical starting point? Well it's consequence in the sense that we're keeping the meaning of the Constitution consistent across amendments the First Amendment the Fourth Amendment the Second Amendment and the plain text is all people and then you look to history and the government clearly bears the burden proving that history now I don't know that the outcome is going to be different in any case based on whether you approach it that way or not but just analytically under Bruin and we can see that in the Heller opinion too where the court starts with the plain text and then moves on to historical examples to talk about exceptions. All right so if I in and I wish I knew how to pronounce this Balashtar that case the majority opinion was careful to say hey stare decisis means something here do we have to be concerned that even if we agreed with you that there's some pull on our court in the power of stare decisis and we should not be straying from Bindrup except to the extent absolutely required by Bruin. Well I think Bruin is very important and even the panel in this case recognized Bruin is very important in kind of resetting things clearing clarifying the Heller inquiry and what's particularly important is that in Bindrup this court put the burden on the plaintiff to show that what the historical justification was and that he didn't fit within that historical justification but Bruin makes very clear that that burden is on the government and that makes a very big difference for example Bruin footnote 11 talking about the meaning of Sir John Knight's case the court says to the extent there is any ambiguity or disagreement well we need to interpret it in favor of the Second Amendment so that is relevant for example of the Pennsylvania Minority Report. As I mentioned if you've got this crimes committed which we submit given the context of that and the meaning of that that word means dangerous crimes but to the extent there's ambiguity it needs to be interpreted in favor of the Second Amendment so for those reasons we think it is an opportune time to reanalyze and ensure that this is consistent with the analysis set forth in Bruin. Judge Hardeman. In Heller the court said that its decision was not calling into question long-standing prohibitions against felons. For purposes of my question I'd like you to assume that ranges of felon or felon equivalent. Did Bruin do anything to alter that? Well Bruin I think clarified what that meant analytically and so I will explain that. So Heller said that we're not undermining presumptively constitutional long-standing laws disarming felons. Now of course the most long-standing federal law disarming felons was limited to violent criminals and 1938 until 1961. Is that what Heller meant by long-standing prohibitions? Well I would submit 1938. Is that long-standing enough? That's not long-standing enough under Bruin you look to the founding and so I think what Heller was saying is that we're presuming these long-standing laws when we analyze them will be constitutional and what's very clarifying I think is Bruin is this treatment of sensitive places. So laws prohibiting carry in sensitive places were also on that list of presumptively constitutional regulations and yet Bruin used that as the paradigmatic example of how it would apply the methodology it was setting out and it didn't speak of presumptions but it said we look at the founding there are some relatively undisputed places where individuals could not carry at the founding and so we can reason by analogy from those and by the way. Who were the people that couldn't carry at the were people who there was some evidence of danger and now as I said at the outset the Second Amendment is meant to protect from public and private violence. So public violence, rebellions, insurrections and the like those were more at the forefront at the founding. So we see the laws for example with the Loyalists, with Catholics during the Seven Years War those were the type of people who were focused on but now that we're in a more peaceful time I think it's consistent with the principle underlying those laws that people who had interpersonal violence can be disarmed but I think the real debate here in terms of history is between us and maybe the public defenders position which says there were no laws at the founding disarming individuals for commission of an offense so therefore this is facially unconstitutional. We're making the position that well at least with respect to dangerous persons it may be constitutional but I think that's really where the historical debate is. Thank you. Judge Greenaway. Good morning. In Brune, New York State provided three historical analogues to its issuing regime and Justice Thomas stated that New York's identification of quote only three restrictions on public carry from the history of the colonies in the Republic were not sufficient to show the tradition of public carry regulation. What I'd like you to speak on is how should we be thinking about the relatively similar language that Justice Thomas used as it applies to the notion of historic analogues? Yes, so Justice Thomas in Brune said that the historic analogues, the presence or absence of them can be evidence of what the original understanding was and so if you have a few outlier laws that are not consonant with the rest of the evidence then that is not going to be sufficient to show a long-standing tradition. I don't think it's a quantitative exercise that's going to be necessarily the same in every case but our submission in this case is that all of the evidence if you look at it is that danger was the key and what's interesting is that even if some of these laws, so for example the panel mentioned Anne Hutchinson and the antinomian controversy. Well the article discussing that said the court disarming those individuals said they might receive a revelation from God to massacre the authorities and whether that was genuine concern or not it's interesting that whenever anyone sought to disarm someone what they appealed to was danger. No one ever appealed to okay this person disrespected the laws therefore we're going to disarm them. Looking at the primary sources it was always danger. How do you respond to the fact that there are historical analogs that aren't focused on danger that are close to what we have here? I am not aware of any, your honor. All of them were focused on danger. If you look at the primary sources they all mentioned danger with the loyalists, with religious minorities, with racial minorities. Again I'll be surprised that I would be surprised that the government stands up today and says we should rely on those laws to interpret the Second Amendment. But all of them they're all predicated on danger. Judge Schwartz? You keep using the words danger and violence. Are they interchangeable or is violence a subset of danger? I think violence is a subset of danger. What is danger then is Judge Garis' question. How do you define danger? I think we look to the purpose of the Second Amendment as I said it's a right to be in case of conflict with another person so we look at the type of conflicts that engender violence. Okay. There's a computer intrusion into the security system of the United States and the atomic secrets are procured by the offender. Danger or no danger? Yes and I think this is where we get to the public or private violence distinction. That is more of a treasonous traitorous act that's meant to take down the entire system. So that is the type of thing that was focused on in the private. Computer intrusion into the system of a entity that if you took their information they could create something that is dangerous but it's a private entity's data. Yeah. Danger or no danger? I would say that's most likely not danger. That's not the type of thing to engender the conflict but again the the key is that the inquiry is danger or no danger. Okay. I hear you. I'm sorry to keep you. No, that's fine. Yes. I'm also from Jersey and we talk a little bit. Reconcile this with me. Okay. You've talked about danger. Yes. Justice Thomas about 14 times in Bruin said law-abiding and every justice other than Justice Barrett used the word law-abiding describing who should have a gun. They don't say a non-dangerous law-abider. Tell us how we can reconcile the deliberate use of that language and then superimpose it on you. Yes. Thank you. So my understanding of that language that everyone understood in Bruin that the individuals that issue in that case were law-abiding under any definition that could be relevant in the Second Amendment context. So the court is using that in the context of that case and it's basically a placeholder for this question of okay well where is the line between what type of law-abiding this makes a person eligible or ineligible for Second Amendment rights. I think everyone agrees there's a line. Where would I find that in the opinion that the court was drawing some kind of line between a really really solid law-abider and everybody else who's a law-abider. Well again the court is not addressing the question of where the line is so you're not going to find it in the opinion and I think everybody but you find the methodology for addressing that question in the opinion which is that we look at the plain text again all Americans and then we look to history to see what type of Americans have been disarmed, dangerous Americans. So that would be where you would find that in the opinion. Okay, thank you. Judge Krause. Yes, following up on what constitutes dangerousness and how we draw that line I'd like to ask you to put in the buckets a few other things. What do we do with embezzlement? I think embezzlement would probably be non-dangerous inherently. Now there could be a the government come in and show this was committed in a dangerous manner. So someone embezzled you know using a firearm to threaten someone or something like that. So there could be three buckets. There could be violent crimes, inherently dangerous crimes like residential burglary, and then perhaps crimes that aren't necessarily inherently dangerous but the government could show this was committed in a dangerous manner. So I think there could be three basic buckets. So we're not looking at categories of crimes we're used for categorical approach. Right. We're not looking at elements. You're saying we're actually going to look at the specific facts of a given case to determine whether it fits in the category of dangerous or not dangerous. Well, that could be the third category. I think the first two categories of violent crime and then using careful rules of thumb, inherently dangerous crimes, those would be more of a categorical basis. Perhaps someone could come in and make an ad-reply challenge and say I'm not actually dangerous. But then only in that potential third category of cases where a non-inherently dangerous crime was committed in a dangerous manner was found in the prior case to have been committed in that manner could be. How about possession of child pornography? I don't think that's inherently dangerous. I mean as odious as the crime is, it's not the type of crime I think that Heller would say would produce a conflict with money laundering. I think it's facially I think similar for that one. It would be on the non-dangerous side of the line. Again, it's, you know, the key, maybe I'm wrong on where the line is exactly in some of these cases, but I think that's just the way it should be thought about. And drug trafficking. I think that is an inherently dangerous crime because it's a lucrative enterprise in which there are no non-dangerous means of resolving disputes and so it's frequently attended by victims of violence. Switching gears for a moment, in your supplemental brief you talked about offenders having the opportunity to regain their rights and their historical analysis for that. Can you speak to that and if we are to be making these sorts of distinctions, especially if it's to be so fact-specific that we're looking at the circumstances of what happened in a given crime, why wouldn't the right place to do that analysis be at a later restoration proceeding rather than considering the initial disarmament? Well, I think there are two questions. One is, does the offense itself disqualify a person from exercising the Second Amendment? That's primarily what we've been speaking about today, but then there could be a second question that if the answer to that is yes, can a person come in and show nevertheless I am not dangerous for whatever reason? And our submission would be that yes, a person should be able to make that showing at the founding, for example, the loyalists who come in and swear the oath and get their rights back. So a person should be able to make that sort of showing and if there is no administrative avenue available, then the courts are open to hear those claims and there's even a dissent and Bindrup recognized courts every day engage in bail hearings, sentencing, analyzing supervised release to determine whether someone is dangerous. So there's not something out of the ordinary for what courts do on a typical basis. Judge DiStruppo? Good morning, Mr. Patterson. You opened emphasizing that we're hearing a non-dangerous misdemeanor offense, right? Yes. And the record in front of Judge Prater was Mr. Range with his non-violent misdemeanor offense and his life over the last 20 plus years, right? Yeah, yes. To resolve this case, we don't need to even go down the dangerous path, do we? Well, you can say this was not a dangerous offense from day one and you don't have to look at anything past that. Right. So we don't, so we could decide this case without going down the path as to what's dangerous and what's not dangerous, what's violent and what's not violent because Mr. Range, by consensus, is a non-violent misdemeanor, right? Yes, you could decide the case on that. Very narrow, correct? Yes. We talked about this burden. Okay, regardless who has the burden, what's the threshold? Is it by preponderance or is it by clear and convincing evidence? I assume it's by a preponderance. The Supreme Court does not clarify. It's the government's burden to prove that with history that something is a well-established and What you're asking us to do is just review Mr. Range's conviction and his right to have a firearm, correct? You don't represent anybody else. I don't represent anybody else, but there is a question, so the rationale could sweep more broadly. It could, but it doesn't have to. It doesn't have to, correct. Thank you. Judge Betus. Good morning. First, is danger a probability of future harm generally or future violence, by weapon? What would you say about residential arson or drunk driving, assuming no gun was involved, assuming you weren't targeting somebody? Is that the kind of dangerousness that would allow disarmament? I think arson historically would be. That was on the list of crimes that Blackstone said could engender an armed response, so I think arson would be. Junk driving does not seem to be the type of aggressive, forcible, and atrocious, as Blackstone said, crime that would engender that type of response. Second, what's the role of the legislature? Is there something like Chevron deference here? Should we be persuaded akin to Skidmore deference, or are judges just making up their own minds based on common sense, intuition, statistics? Help us to understand whether the legislature or legislative judgments play any role here. Yes, I don't think there is deference to the legislature. I think Bruin rules out deference to the this court, analyzing, yes, as your Honor said, careful rules of thumb to determine which sorts of crimes are inherently dangerous. Is there a power to persuade if they've made some kind of judgment or findings of dangerousness? Well, yeah, obviously, yes, that would be one thing that you would take into consideration when determining whether something... Final question. These group-type judgments don't evince anything like the modern narrow tailoring test, so that suggests that we're not going to nitpick them for being a little over-inclusive or under-inclusive, right? There's some kind of generalization, even some stereotyping going on in some of these at the time of the founding. Yes, I think there are some play in the joints, and that's why I think there would be important to preserve as applied challenges on the back end for people who fall on the other side of that, but yes, I think it does not, you know, again, the court did away with scrutiny analysis, so I think under the history analysis, again, the careful rule of thumb is a good articulation. Thank you. Judge Porter? I understand that the dangerousness is the common element that you find in founding-era crimes that might have resulted in disarmament, but isn't there a danger that if you abstract dangerousness as kind of a general principle, then you open the analysis to the kinds of questions that Judge Krause was asking. Is embezzlement dangerous? Is drug dealing dangerous? Or you could speculate about all sorts of things. Are they dangerous? Don't you always need to tether it back to the historical tradition of disarmament? So, for example, was embezzlement a disarming crime at the founding era? Was larceny, was fraud, crime and falsity type crimes, were any of them disarming? Well, no crimes were disarming at the founding, so that's why, you know, I said the real debate in this case, I think, historically, is between us and more of the public defender's position that this is basically unconstitutional. Even dangerous and violent crimes were not disarming? Right, right. No crimes were disarming at the founding, but what I've said is that there was a tradition of disarming dangerous people. The focus was more on public violence at the founding. Some crimes were, many crimes were resulted in capital punishment. Would that be an adequate proxy? Because you, we killed you, so of course you can't. No, that wouldn't be an adequate proxy because someone obviously does not need a Second Amendment right to self-defense if they're going to be executed, but if they pay their debt to society, they're in anyone else, and we wouldn't say they lose their First and Fourth Amendment rights because they could have been executed. So, no, the fact that they could have been executed is not a good proxy. Thank you. Judge Mady? Good morning, counsel. Just two questions. First, why is the proper historic analog to dangerousness as opposed to, as you described, actual or perceived treasonous contempt for America's civil authorities, loyalty to the political community? It seems as though the examples you've given were really those types of crimes, not something that would just categorically be called dangerous. Yes, no, I think that's, that's correct. Historically, and as I've said, as Heller said, the right is the right against public and private violence. We see at the founding the focus is on individuals that are at risk of public violence, rebellions, insurrections, and the like that are disarmed. Our submission is that does not mean that there's not also an understanding that you could disarm people for more of a threat to private violence. Maybe because we're in a revolution and we need these people to fight for us, maybe that's why we're not disarming them. But in any event, that is why. That, I think, that is the real dispute in this case is between facial unconstitutionality and as-applied unconstitutionality, which is what we're advocating. Turning to the role of the legislature, you've talked often about Blackstone, who certainly thought that the right to bear and use arms was a natural right retained by all Americans. You also talked about due restrictions suitable to their condition and degree. Why isn't that an apt description of what 922 G1 is attempting to accomplish? Well, because that's not part of the American right. The English right was only held against the Crown and not against Parliament, like all English rights, and the Second Amendment was meant to correct that. That was abused during the colonial times, and that was one of the things that the Second Amendment was reacting against. So, it is a right that attaches both against the legislature and against the executive. Thank you. Judge Phipps? For purpose of looking for a historical analog, should we give any weight to historical laws that limited the right to bear arms based on religion or race grounds? No, and I think we should not be building on those, but I think what those are informative of is, even with respect to those laws, what the primary sources show, for example, I read, Sheriff Scott, is that they were predicated on danger. So, you say they still have danger, but they were drawn on lines, and so we shouldn't give them any weight, but if we don't give them any weight, then what's left? Heller said we have a long-standing tradition, certain long-standing prohibitions for certain crimes. Are we left with some 20th century laws, or do we have to go back to the English Game Act of 1671? Like, if we take those out, what's left for historical analog purposes? Right, right. So, I think they are indicative of the fact that there was this understanding that dangerous people could be disarmed, even if those particular lines are not things we should draw from, and similarly with the Loyalists' provisions during the Revolution, and then all the ratified defension proposals, which again, Heller says it's not a great source, but when it's consistent with all of the other evidence. So, in New Hampshire, you have rebellion. In Massachusetts, you have people who are not peaceable. In Pennsylvania, properly interpreted, as I have explained, crimes committed would be dangerous individuals. So, you do have some evidence of that understanding. Judge Freeman. Would as-applied Second Amendment challenges to 922g1 be necessary if there were a properly funded and functional restoration of Second Amendment rights mechanism? I think, you know, a constitutional challenge is always available, and administrative remedies, in order to bring a constitutional challenge, but I acknowledge that would be a different inquiry, but I think it would not preclude them, but I think the inquiry in a challenge would largely mirror what the inquiry in the 925 process would look like, an as-applied challenge. And your argument that the line is dangerousness, you're referring to both nominal years. Is there a point at which those people who fall in this non-dangerous conviction category would lose their rights during, perhaps, the pendency of a criminal sentence, a period of incarceration? Well, obviously, if you're in prison, you can have your rights limited in ways that people who are not in prison cannot. So, you're not going to be able to have a firearm in prison, but if you're in the community and you've not done something that is indicative of danger, then, yes, there would have been nothing to have a basis for disarming you, disqualifying you from exercising the right. And so, I understand in prison that there may be other regulations that disqualify you from having an arm, but does the Second Amendment continue with that person who has been convicted and sentenced to prison? Does that Second Amendment right continue during his period of incarceration? No, because there are limitations on all sorts of rights. First Amendment, Fourth Amendment rights, other rights that can take place in prison that are not applicable to people who are free. And what about if they're in the community but have not yet paid a fine associated with the crime? Then, I think they would have. And, again, Bruin tells us to look at how and why rights are burdened in prison. Prison officials are charged nominally, at least with protecting you. If you're in the community, you have as much a need of self-defense as anyone else. If you've not committed a dangerous offense, there's no basis for disqualifying you from the right. And our newest judge, Judge Montgomery Reeves. Good morning, counsel. I want to piggyback off of some of the questions that you were just asking. Is it your position that if we rule in your client's favor, does that mean that 922g1 was never constitutional as it applies to your client? Correct. So, it would be, is your position then that your client, for example, while he was on probation, had the right to own a weapon? Correct. And if we adopt the position that you are suggesting, if there was a person who was convicted of a nonviolent felony, was out of prison, on probation, that person could own a weapon the moment they walk out of prison? Correct. Thank you. Judge Roth. Our oldest judge. This litigation was started by a complaint that the application of section 922g1 to Mr. Range was unconstitutional under the regulatory powers of Congress. And it's been my long, long experience that in possession of guns, that there has to be, under 922g1, there has to be identification of a firearm that has traveled in interstate commerce. How do we have jurisdiction here? What is the firearm that gives us jurisdiction? Well, this is a pre-enforcement challenge, and Mr. Range has twice attempted to, when he was not aware that he was a disqualified person, to purchase a firearm from an FFL, so a person who's engaged in commerce. Has he identified that as a firearm that had traveled in interstate commerce? He has not specifically alleged that, to my knowledge, but still this statute would disqualify him from accessing a firearm that has traveled in interstate commerce, so he is being injured by that. He can't engage in purchasing a firearm in commerce in that manner. But this And I have also learned many times over the years that in the federal courts, we cannot accept an action that is based on legislation by Congress that is not within the powers bestowed on Congress by the Constitution. And frankly, I am looking for a hook on which to hang your claim that applies, but I do not find either in the past or in the future any identification of a firearm that has traveled in interstate commerce. Is that a correct evaluation? Well, I believe the firearms that he possessed. If we were to get that evidence, I would be confident that it's not in the record, but that has never been held to be required for standing. Withstanding, is this law harming you? This is harming us because it prohibits him from entering commerce. He has said, I want to enter commerce and acquire a firearm. This law prohibits him from- Is that how it was pledged? Well, it was pledged that he would acquire a firearm, but for this statute and examples of how he's been harmed by this statute is that he had sought to enter commerce to acquire a firearm twice in the past and was denied access to a firearm because of this law. But there has no showing by you of any specific firearm identified as having- No, he's not identified the specific firearm that he would acquire. Judge Ambrose? As I hear all the questions that have been asked, is the issue before us, when is a crime so serious that the offender can be permanently disarmed? Is that the right issue? I don't know that serious is the correct word. I think it's whether the crime is of a type that could cause someone to be disarmed. And our position is that it would have to be a dangerous crime. A dangerous crime would be a serious crime. Yes, but there could be some serious crimes that aren't dangerous. So that's why I'm trying to be precise with my- Is the time that we look at for purposes of determining what is a qualifying crime that permanently disables? We've been talking about the founding. Is it the founding or is it 1868? Well, it's the founding. I think it's particularly straightforward in this case when it's a federal law. So it's the direct application of the Second Amendment. Heller held that we looked to the founding to interpret the Second Amendment when, again, it was against a about whether, particularly with respect to the 14th Amendment, that we would look to 1868. And some scholars have said that that somehow updated even the Second Amendment as applied to the federal government. The Supreme Court has never held that. In every case where the Supreme Court has looked at the provision of the Bill of Rights, they looked at 1791. So this court is bound by those findings, those holdings, that the Supreme Court has flagged this potential issue could be of relevance to scholars or future cases before the Supreme Court. But with respect to this litigation, 1791 is the proper answer. If we were to stick with 1791 and you talked about dangerousness, are religious pacifists dangerous? Ones who, at that point, Quakers, for example- Well, Quakers in 1791. So those oath statutes, they were not barred from affirming them solely because of their religion, because it said you had to swear an oath or affirm. So they could have affirmed them. Yes, they were dangerous because Quakers did have arms. They engaged in hunting. They could have given those arms to loyalists, to other people who would fight if they would not swear to support the American cause. But again, as I said, there were twin aims for those statutes. One was to disarm people who were dangerous, but two, there was a shortage of arms on the American side. So if there are individuals in the community who are not going to fight for the American cause, we're going to take their arms and provide them from individuals who are- and we see that in the March 1776 recommendation from the Continental Congress that colonies should do this. And finally, Bruin Note 26 says that wartime measures are not necessarily the best indication of what the Second Amendment means in peacetime. Are loyalist grandmothers dangerous? Excuse me? Were loyalist grandmothers dangerous in 1791? Well, again, to the extent they could be providing aid and comfort to the enemy, yes, and to the extent they had arms that were not going to be used for fighting for the Revolution, yes, because those arms were needed for that purpose. Thank you, counsel. We'll hear from you on rebuttal. Thank you. And we'll hear from your friend now. Good morning, and may it please the court. Kevin Sutter from the Department of Justice for the United States. The Supreme Court took pains in its decision in Hebert to emphasize that it was not casting doubt on this exact sort of law. It again reassured in McDonald's the same thing, and in Bruin the decision reflects throughout the principle that laws disarming people who are on the basis of their non-law-abiding behavior are consistent with the Second Amendment. I'd like to briefly emphasize three points. First, when Congress made the judgment reflected in the statute more than 50 years ago, it built on centuries of tradition canvassed by the panel decision, and that tradition established that legislatures have broad authority to make categorical judgments to disarm classes of people based on serious disrespect for the rule of law. There are abundant historical analogs for felon possession laws. These include laws categorically disarming loyalists, religious groups, and others based on a perceived failure to abide by the nation's legal terms. Moreover, at the founding, felony crime was subject to severe punishment, including death. And just as legislatures have long had the authority to decide that those convicted felonies may forfeit the right to vote, to hold public office, and to serve on a jury, so too may legislatures be the ones to make the determination that a felony conviction causes someone to forfeit the right to bear arms. The second point I wanted to emphasize that I think much of the questioning today has thrown out is that plaintiff's proposed dangerousness limitation both does not follow from the text and historical tradition that the panel discussed, and would be completely unworkable in practice. As this court has repeatedly recognized, including in its decision in Folagetar, Holloway, and Bindra, the dangerousness theory depends on an overly narrow view of the historical record. Historical law did not make distinctions between dangerous and non-dangerous individuals in the way that plaintiff's counsel suggests that this court could make distinctions among the sorts of offenses and offenders. Instead, we see evidence that in the founding era, pacifists and other non-violent people were disarmed, and we see evidence that capital punishment was available for non-violent crimes, including counterfeiting, forgery, and force theft. Plaintiff seems to want a regime of adequate challenges in which judges are making all of the judgment calls about which sorts of crimes are dangerous enough on an adequate level. That regime would overlook the founding era understanding of the proper role of legislatures, and instead inject a standard of inquiry into an area that calls out for clarity and certainty. That's particularly important to individuals who have disqualifying convictions and need to understand the consequences of them, for law enforcement officers in the field who need to understand when they can constitutionally enforce this law, and for courts that would be reviewing a flood of litigation were the court to announce a novel danger in this theory. That ties into the third point I wanted to emphasize before taking the court's questions, which is that plaintiff is asking this court to stand entirely alone. In addition to inviting the court to part ways with what are now more than 100 district court decisions upholding the felon possession statute since Bruin, plaintiff's position is irreconcilable with decisions of several courts of appeals that addressed this issue before Bruin. That includes the DC circuit in Medina, which explicitly conducted a text and history focused approach, and it also includes the categorical holdings of several courts of appeals, including the fourth, fifth, tenth, and eleventh circuits, whose analyses had nothing to do with the sort of means and scrutiny that Bruin changed. And so with that I see that I still have a bit of my five minutes left, but I'm happy Terrific. Your brief seems to argue that anyone who falls within the ambit of section 922 g1 can be constitutionally disarmed. Do you think that Bruin overrules Binderup to the extent Binderup allows as applied challenges to section 922 g1? I'm not sure that I would say that Bruin overrules the recognition in Binderup that this law is spatially constitutional and is presumptively lawful. I think the impact that Bruin has is that it reinforces that the sort of analysis, when you're doing this sort of historical analogizing, has to look like what the panel did in this case and can't look like the sort of multi-factor judge empowering balancing of how serious the crime is. And so the judgment that Congress made that's reflected in the statute that has this long-standing historical support was that a conviction for a crime punishable by more than one year is a proxy for the sort of threat to society. So where does that leave us with respect to as applied challenges? So I think the panel's analysis in this case reflects that a conviction for a crime punishable by more than one year in imprisonment is an adequate basis for determining someone's assistance with the Second Amendment. All right. Judge Jordan? So what's your limiting principle? That's it? That it's strictly whatever a legislature says. So yeah, jaywalking. They say, you know, habitual jaywalkers are bad for everybody. So you can go to, it's a misdemeanor, but you can go to jail for a year and a day. Government's position is, to use your words, that shows, quote, serious disrespect for the law and therefore they should forfeit their individual right to bear arms. Have I understood your position correctly? Yes, our position is that a crime punishable by more than a year shows serious disrespect for the rule of law. No matter what it is. No matter what it is. Jaywalking. If some legislature, the Rhode Island legislature was outraged by jaywalking, they could label that as something, the maximum penalty of a year and a day. And your view is that's consonant with the Second Amendment, consonant with the history that you propose to be the history of disarming serious felons. So of course that's not what we have here and I'm happy to talk about the specifics of this event, but I understand the court's question is coming from understanding the hypothetical. I'm on the clock too. The hypothetical. I do think the record establishes that it's for the legislature to decide that a serious disrespect for the rule of law, what the D.C. Circuit and this court itself have referred to as... How do you square that with Bruin? How do you square that with Bruin saying it's the government's burden to affirmatively prove its firearm regulation is part of the historical tradition that delimits the outer bounds of the right? Square that up with that language. I think the easiest way to square this with Bruin is to recognize that the Supreme Court has repeatedly said that felon dispossession laws are one of the categories of laws that are consistent with the Second Amendment. And in Bruin, the principle that law-abiding individuals can be disarmed was reflected in many places and if I could just briefly highlight two of those. One is 9, which discusses the permissibility of challenge to regimes and what the court said was that those regimes are constitutionally permissible because they are, quote, designed to ensure only that those bearing arms in the jurisdiction are in fact law-abiding responsible citizens. Would be great if we had more time to chat. I think I'm past my two minutes. Let me ask you about longstanding. I want to ask you about divorce, thievery, and counterfeiting, but before we get to that, does your argument on that mean that 1938, the first federal felon dispossession statute, does not qualify as longstanding enough under what the court has written? I think the court has emphasized that, of course, founding era sources are particularly important and when the court was referring to longstanding prohibitions, there's no reason to think that the court was thinking of only the prohibition that was not in effect at the time and has been in effect for more than 40 years on all these crimes of violence, but was referring to the category of felon dispossession laws that included the ones actually in effect since 1961, which applied to anyone convicted of a crime. So you're saying 1961 is longstanding enough under what the court wrote in Heller and McDonald and Bruin? I'm saying that's the sort of longstanding law that has founding era roots that the court was talking about there, and I think it's important to... Well, but there are no... Are you suggesting there were founding era laws that said all felons are forever dispossessed of their firearms? I didn't see any of those. No, and I think that's exactly the point, is that we need to do some amount of analogizing from the founding in order to avoid the... I think no one has suggested that the result... No one except perhaps the public defender's office, as was mentioned by Frank Discompo, has suggested that the statute is... Let's talk briefly about the founding laws then. Counterfeiting, horse thievery. When I look at the punishment provisions in those statutes, and there are many statutes involving different crimes, some violent, some non-violent. I don't see anything involving permanent dispossession. The way those laws seem to be written, when you commit the... If somebody comes upon another person armed, steals their horse, and gets caught, then they may go to jail, they could have their gun forfeited, et cetera. But once they spent their time in prison or what have you, I don't see anything in those laws that say, once they get out and get back into society, they can never have a gun again. Are there any laws that say that? I think the best laws are the ones discussed by the panel, which were not about the consequences of a crime directly, but there is a line of authority showing the consequences for a criminal conviction for a certain specific bundle of rights do date back to the founding. And that bundle is their political rights, is the term that's used in some of the literature, and they're specifically the rights to... You can't cite a statute or know that specifically says you are disarmed for something, but neither did anyone come up with a statute that says you were disarmed upon release from prison if you were convicted of murder. And so I think there is some amount of analogizing that's necessary to the sorts of disarmament laws that existed. And I think this is a point that Your Honor made in your decision in Bindrup, to quote a portion that you were quoting another source in turn, you said, Novelty does not mean unconstitutionality. After all, the paucity of 18th century gun control laws might have reflected a lack of political demand rather than constitutional limitations. And so for the same reason that we need to extrapolate from asking what would the founders have thought themselves about depriving someone who was convicted of murder of their firearm after release from any custody if they were released, so too do we need to ask how that question applies to other non-law-abiding individuals. Judge Greenaway? Thank you. Good morning. Two quick questions, hopefully. Does Bruin refine Heller? Does a long-standing prohibition satisfy the historical Heller law? I think Bruin reaffirms the aspects of Heller that are most relevant here, including the reassurance about long-standing Heller and possessive possession laws, and including the principle that non-law-abiding individuals can be disarmed consistent with the Second Amendment. Let me ask you this. Justice Scalia noted in Heller the people is a term of art that means the same thing in the Second, First, Fourth, and Fourteenth Amendments. Why should we think of the people in a narrower fashion? I think the people that Heller opinion referred to are the members of the political community, and if we look at what the political community was, those are the people who have the rights to vote, to serve on a jury, to hold public office, and to bear arms. And so legislative authority to deprive people of that specific bundle of rights upon a felony conviction extends to support this law. And I think the other thing, of course, that's important to keep in mind about Bruin is that we have concurrences that, again, reiterate in explicitly saying that felon possession laws are consistent with the Constitution of both the Chief Justice and Justice Kavanaugh's concurrence, and Justice Alito's concurrence emphasized that nothing that Bruin did cast doubt on the existing reassurances about the sorts of laws that are consistent with the Second Amendment, and felon dispossession laws are one of those categories of laws that have been on the books and have this historical tradition that stretches back. And then, meanwhile, when we think about what would it mean to start carving up within those permissible categories, I think we end up with this entirely chaotic enterprise where I heard Plaintiff's Counsel attempting to say yes or no to whether certain crimes meet, at an offense level, meet a dangerousness test. We also get into whether it's specific things about the offender, and I think I heard him mention we should look at offense conduct. But, of course, many convictions are premised on guilty pleas, where there will not be a robust record of what the facts were of the conviction, and I also think I heard the suggestion that certain people, at least, can come into court later and say, even though it was fine to disarm me for a little while, now it's been long enough and I'd like to come into court. Thank you. Judge Schwartz. Thank you. I'm going to follow up on that point with you, and then I have another question. We've heard mention about coming back to the court after some time and asking to be re-armed. Can a district court conduct the equivalent of a 925c type proceeding to make a determination whether this person should be re-armed, and that the continued application of 922g1 to this individual person, based upon that qualifying predicate offense, is something a district court judge can do under the declaratory judgment act? No. Why? I think, so, assuming that you're talking only about a constitutional claim, because, of course, the actual statutory claim has been only the constitutional claim. I think that's the sort of constitutional claim that I should clarify. I think the person can file the complaint, but the reason the complaint should be dismissed is the reason that the panel opinion here reflects, which is that the legislature had the authority to categorically disarm people on the basis of their disqualifying conviction, and there is not a historical tradition saying that someone has a right to come in and get an in the history to re-arm after someone has forfeited their rights. There's not authority saying it's constitutionally required. Of course, there were examples of more... But a lot, I'm sorry to interrupt you, but we're talking about a period before the Constitution even existed in some of the historical pieces, right? So, we're looking at the history of the United States before it was the United States. Were there laws that allowed individuals to be re-armed after a qualifying conviction? I think I'm familiar with laws saying that a disarmament should only be temporary. Nothing is coming to mind on a law sort of doing a back-end individualized process. Right, but there must be some meaning to something being temporary. That is, it can be resolved. I'd like to ask you about... You cite one statute, one in your brief, which is a statute that I think may be enacted by the same Congress that ratified the Second Amendment, and it sets forth a number of different crimes. All of them have to happen within the exclusive jurisdiction of the United States. They're all federal crimes. If you look at Section 24, Section 24 says that nothing concerning no conviction or judgment on these offenses, those that precede it, shall work a corruption, a flood, or forfeiture of a state. That's a quote from the statute. Does that undercut any kind of claim that the government contemplated permanent disarmament? No. I think the reason that law is most helpful is because it shows that this line between violence and nonviolence as to serious crimes continued through the time of the founding, so the provision that we are focused on is the one saying that someone who committed a form of counterfeiting at the founding shall be punished by death. I totally agree on that, but at the end it says no forfeiture of a state. Should that be informative on whether or not guns need to be available to be returned back to a convicted form? I don't think so. I think the severity of punishment for nonviolent crimes is the important takeaway there, and the fact that that severity started to lessen in certain respects by the time of the founding, but not in every respect, just shows that we also are, you know, in addition to those sort of criminal laws, there are all these disarmament laws that the panel decision cited that complement those to show why at a minimum what is today is the most serious form of crime reflecting, I think that the phrase that was used in some of the decisions for felony is grave misjudgment and maladjustment is what the D.C. Circuit and this court, I believe, have both used and the Fourth Circuit, is the sort of crime that someone can be disarmed for today. Thank you. Judge Krause? To confirm, you don't disagree that today Mr. Range is law-abiding? I think the way that term has been used in the decisions is meant to capture the idea that someone who has a felony conviction on their record and is subject to a felon disarmament law can be disarmed since it's the Second Amendment. So, I think he is not law-abiding in the sense that the Supreme Court was using the term, which was as a shorthand for the explicit approval of this sort of law. So, if we take, put aside the welfare fraud conviction almost 30 years ago, without that in the picture, would you describe over that period of almost 30 years, would you agree that Mr. Range was law-abiding? I believe he's committed some other more minor offenses that were not disqualifying under federal law, but setting that aside, there's, correct, but there's not something in the record. Of course, we have primarily his declaration of his deposition and sort of further inquiry into every detail of his life may have been the sort of thing that ATF would have done under Section 925B, that restoration provision we talked about, but it's not the sort of thing that has been necessary to do or the courts have the competence to do in evaluating a supply challenge. Is it the government's position that Mr. Range poses any danger today to public safety or welfare? I think Congress made a judgment that he poses precisely the sort of threat that there is an analog for at the founding. What the Supreme Court has said in describing the purpose of the felon dispossession law is that the purpose is to keep firearms away from, quote, those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society. And I think it's that sort of judgment that was made in the founding generation when, for example, legislatures in the founding era disarmed nonviolent religious minorities on the basis of their perceived threat to society. And if I still have a few seconds, you've talked about the prohibition on felon dispossession as being lawful and constitutional, but the Supreme Court, in those opinions you cited, is using the term presumptively lawful. Can you speak to that? What's the significance of that word presumptively and what are its implications for any verdict? So, of course, that is an advert in a footnote. I think the best explanation of this I've seen, I think, is what Judge Fuentes wrote in his vendor of opinion. There's a section on a note on the word presumptively. And what I think he explains is that that single word in the footnote does not in any way undercut the Supreme Court that has to provide reassurances that this law is constitutional. It perhaps suggests that other laws in that list that are not as clear where the meets and bounds of the law may be, may be subject to challenges about whether you're inside or outside the category, but the felon dispossession law is a sort of categorical law that the Supreme Court was providing reassurances is consistent with the Second Amendment. Thank you. Thank you. Judge Estrepo. Just following up on Judge Krause's questions, understanding that we're only considering Mr. Range and his disqualified offense, right? This is an as-applied challenge. The government's not taking the position that misdemeanor welfare fraud conviction is a violent offense, correct? I don't think it's violent in, I guess, it depends on... I can't think of a way of defining, yes. I would say it's not a violent offense, but of course defining violent offense in general is difficult. We don't need to go down that road. I think the court needs to realize that if it were to adopt Plaintiff's of trying to come up with dangerousness based on the offense or the offender and including violence as a piece of that, it's just going to be a totally unworkable, unadministerable decision that is really within the can of Congress's judgment. I guess, but so if we limit our analysis to Range and his specific offense, we don't need to concern ourselves with whether or not it was violent, correct? I think our view is that the fact that the court needs to know about Mr. Range is that he was convicted of an offense that was punishable by more than one year in imprisonment and is disqualifying and is a felony equivalent as he recognized it. Thanks. Thank you. Judge Bevis. Thank you. You don't dispute, you agree with your friend on the other side that the government bears the burden of justifying this firearm restriction, correct? I think it's actually not entirely. Do you agree? Do you say that that Bindrup is still right to put the burden on the challenger? I think there is a potential way of getting there, but ultimately the question doesn't affect the outcome in this case. What's the government's position? That the challenger needs to show they fall within the text, at which point the government would bear the burden of showing that historical tradition supports a disarmament law? Do you agree that the government bears the burden of showing a historical tradition? If it's necessary to go into the sort of, you've decided the text covers the person, then yes, but here the text doesn't cover. Let's assume that we think the text covers, you have to show historical tradition. Do you agree that you put nothing in the record to show that Mr. Range is violent or that his offense is violent? Of course, we've primarily briefed the post-trial case in a couple of shorter briefs. I don't think there's anything in the record, but I think that illustrates the difficulty of coming up with a record. There's no need for a remand here. I think there are... Violence. On that, I think it depends on what the court says, the rationale is of any decision. All right, so you're not arguing that you need a remand. How about dangerousness? Is there anything in the record or in the crimes that would make it dangerous? I think that the fact that Mr. Range committed an offense that involves... I assume we disagree with your reading of the rule. We require dangerousness. Is there anything in the record or anything you'd want to put in on remand to satisfy a dangerous test if we reject your seriousness approach? I don't want to get out ahead of what we might say in response to a court hypothetical decision adopting an amorphous, potentially amorphous dangerousness standard, because I think the relevant principles that the legislatures are entitled to rely upon is... Okay, but you don't have anything about this specific crime or this specific case. You can fight the hypo, but you don't have anything within the hypo. I think that the specific crime that Mr. Range committed, willfully defrauding the government of thousands of dollars of public welfare assistance, demonstrates the sort of disrespect for the rule of law that was an adequate proxy at the founding. You don't have anything that suggests dangerous by means of weapons? I don't think anything's coming to mind in the record about Mr. Range specifically using a weapon. You talked about examples of rearming people that you couldn't think of any. What do you make of the laws governing Shays' Rebellion and the Tories and the Civil War rebels, which all provided for ways, after some period of time, to abjure rebellions, swear loyalty, and get one's rights back? Aren't those examples of rearming people after a time? Don't they suggest that it was tethered to something about the person in that period, rather than a permanent status? I think those laws show that legislatures could make these judgments. And of course, for example, the Shays' Rebellion law was a condition of getting a pardon from a government, which just is very different to the sort of law we're talking about here. I did want to come back to Your Honor's prior question. I think it is, if the court is looking at every individual circumstance of Mr. Range, I think there's some relevance of the fact that he continued to possess firearms after being denied on multiple background checks, which I think reinforces that Congress can make this sort of judgment that someone who is so untrustworthy as to commit a felony fraud crime or a felony equivalent fraud crime in Mr. Range's case, just like the Plinkett and the Falagettar case, has shown the sort of disrespect for the rule of law that the profession faces to disarm them. Thank you. Judge Porter, maybe 15 minutes ago, you said something that caught my attention. I'll paraphrase. You said something like the paucity of early American criminal laws resulting in disarmament may have been from a lack of political demand, but isn't it more likely that the paucity of early American laws resulted from the fact that the federal government didn't have any enumerated power to disarm the people and that that lack of power was buttressed by the Second Amendment? I think that right now, we don't know exactly why the founders did not enact a law saying that when you are released from prison for a murder, you don't get to have a firearm. But the question is why, given the undisputed premise that the law is fine as applied to that person, the same principle doesn't extend to saying that disrespect for the rule of law is the basis for disarmament historically. Regardless of what the states were doing in 1795 or 1800, could the federal government have enacted, could Congress have enacted a law disarming the people? I'm not sure. Of course, society was very different then and the understanding of what Congress's role was and the scope. I'm just talking about Congress's enumerated powers. I mean, I think here, as Judge Roth pointed out in her questioning, I think that the constitutional source for this law has been rooted in the Congress clause. In 1937, after J. N. L. Steele, does that explain maybe why we don't see the first law until 1938? I think there are a variety of potential reasons why there wasn't an exact law like this. And the principles that we are trying to rely on are to explain why when you look at the founding era laws that there were, and when you look at the complete absence of any indication that someone thought a law disarming criminals would have been unconstitutional, the conclusion to draw is that this law conforts with founding era tradition and precedent. And I think on that latter point, it's important to keep in mind what the Bruin decision said about sensitive places. What the court said there was that there were, they could point to only a handful of founding era laws that said you can't bring a gun into a legislative assembly or a polling place or a courthouse, but there was also no, nothing in the historical record to show that there was dispute about the constitutionality of those laws. So similarly here, when we look at the highly influential Pennsylvania minority report saying that people could be disarmed on the basis of crimes committed, you don't see anyone saying, wait, wait, no, we can't disarm people on the basis of their serious criminal conduct. The conclusion to draw is that that is permissible. And it's brief in the Rahimi case, the Fifth Circuit case, the government said about the Pennsylvania minority's dissent that it, quote, reflected the well-established common law principle that dangerous people could be disarmed. Are you backing away from that position that you took in Rahimi? So I think that one thing that can get sort of tangled up in these cases is that dangerousness is, of course, a sufficient basis for disarmament, but it's not a necessary one. And I think that's the principle that it shows why certainly dangerous criminals, or in that case, you know, dangerous people who are subjects to a domestic violence restraining order can be disarmed consistent with the Second Amendment. Thank you. Judge Mayne. Good morning, counsel. You've said, if I understand your argument, you've said several points now that dangerousness is not a necessary condition, a sufficient condition, and that what we're really looking for is something that shows a disrespect for the rule of law. That's the adequate proxy. Does the government take the position that the disrespect for the rule of law as it's defined it today is sufficient to disenfranchise other retained rights in the Constitution? I think for this case, all the court needs to recognize... I'm asking the question. The rights to vote to hold public office and to serve on a jury can certainly be taken away. What about the rights in the First Amendment? I think that's a tougher decision, and I think that the court doesn't have to... What makes it tougher? If you could help me out, what makes it tougher? The right is different, and the people to whom the right belongs could be different as well for reasons that track differences in the nature of the right. The answer for the Fourth Amendment, the Fifth Amendment, everything? I believe the phrase, the people, is used in the preamble of the Constitution in a portion of the Constitution dealing with voting and in the First, Second, and Fourth Amendments, specifically only in the assembly clause of the First Amendment. I think the panel's decision here to explain it wasn't casting doubt on the right of felons under the First and Fourth Amendments. It was entirely consistent with the Fifth Circuit's decision in Portillo-Munoz and the Eighth Circuit's decision following it regarding why people who are not in the country legally can be disarmed as not part of the people. You've talked about the chaotic enterprise that would follow a standard of dangerousness or an allowance of individuals to retain their Second Amendment rights after some sort of disrespect for the rule of law. I think you're sort of describing that as novelty, but to paraphrase you, paraphrasing Judge Harmon, the novelty of that outcome doesn't mean that it's a constitutionally erroneous decision. And then going back to what Judge Porter asked, isn't the issue again here that we're looking at an application of the laws of the United States in a way that simply wasn't conceived of at the time of the founding? And what do we do about that inherent lack of power and the following lack of example? Well, I think that there are adequate examples to show that this law as written is constitutional and the judgment that Congress made was that people who commit crimes punishable by more than one year and in prison can be disarmed, convicted of the Constitution. And there are several, I think, limiting principles that can mean that the legislature's authority to do that for people to make convicted of offenses showing that sort of serious maladjustment does not give the legislature, I think as the panel put it, there is not sort of unlimited discretion for the historical understanding of what can follow from the appropriate consequences from a felony conviction. I think Chief Judge Sutton used some language along those lines in his decision in Tyler to explain why this law is certainly consistent with the nation's historical tradition. And that's, I think, why the Supreme Court has reiterated in its decisions in McDonnell's and why three justices concurred in Bruin to emphasize at that point that this law is constitutional. Thank you. Judge Fitts? Thank you. There's not many cases examining Article III standing in the criminal context, but I want to just talk about it briefly. I want to reference it possibly from the perspective of looking for a savings construction of this statute, almost a savings construction. And it requires an injury in fact that has to be actual or imminent. And so if 922G is brought only in cases when there is an actual or imminent injury in fact associated with a felon in possession of a firearm, doesn't that kind of solve the danger barrier, solve everything else, but we look to Article III to give a limiting construction of 922G? I'm not sure. It's not an issue that I think has been considered thought to before, so I don't want to get out ahead of making something up on it. But I think that the principle here is that this law is constitutional as written, and there isn't a coherent dividing line to carve off part of the statute under which someone would, walking around in the real world, understand whether their conviction that right now is a very clear line they've been convicted of something as a felony or a felony equivalent. Okay. My time's short. Let me ask you a follow-up question. It's not really a follow-up. It's just a completely different direction question. I seem to be hearing you saying that there's really no as-applied challenge that could ever win to this statute. So the scenario I'm thinking of is a person who is convicted in their 20s of a crime punishable by more than a year and a day. They live an infraction-free life for the next 60 years. What you're saying is we almost have like a disarmed octogenarian problem. If they're in their 80s, you would say, no problem, no as-applied challenge. They can be crime-free for 60 years, but the permanent disarmament that comes from 922G from a crime 60 years ago still must apply, and they would have no successful as-applied challenge. Is that your position? Yes. But of course, there are redress procedures for people, including expungement of their record, which in Pennsylvania, for example, is available once you're at the age of 70. Other states have made more robust procedures available, and of course, a person with conviction can always seek a pardon, and that would get them out from the federal disqualification. But if none of those worked, there's still no as-applied challenge for that individual. There's not a constitutional right to have a firearm back after a felony conviction, of course. The court could rule more narrowly in this case if it wanted to focus on aspects of this particular crime, on aspects of fraud, and why fraud is the sort of offense dating back centuries where we willfully deprive, especially willfully depriving the government of thousands of dollars, just like the offense in the Palagiatar case, is the sort of crime that a legislature can determine, felony or felony equivalent fraud, you're out of luck. Thank you. Judge Freeman? If this court were to adopt your rule of deferring to legislatures, what would prevent legislatures from enacting laws that protecturally disarm many of its citizens? So if we're talking just about enacting criminal laws, I think there are many real-world impediments to a legislature deciding that they're going to use their criminal code and their resources of criminal convictions of people for felony and felony equivalent offenses to achieve a disarmament goal. I just think that's both not a realistic understanding of how legislatures craft criminal laws. Well, let's assume that it happened. Would an individual convicted under such a pretextual law have any recourse in the federal courts? I don't think the Second Amendment would provide them with that recourse, but perhaps it's a closer question. As I think the panel recognized, there is some pretextual basis for disarming someone. It might come closer to the lines. But here, we're talking about a fraud offense that's been on the books in Pennsylvania, I think, since the 1960s, and it dates back to the sort of offense that existed at the founding and is analogous to crimes of war. But you would agree that if we were to adopt your deference to the legislatures, that would apply to future offenses as well, agent offenses that are not on the books today? I think the rationale of offenses that are currently punishable by more than a year and subject to the statute would certainly, I think, it would cover this case. And if the court had a basis to revisit that in the future, it would consider that. But I think that's getting far out ahead of the issue that's raised here, which not only involves a felony equivalent crime, but involves a fraud crime. So do you agree that the regulation at issue in this case addresses a general societal problem that has persisted since the 18th century? I think it's tough to know exactly what the Supreme Court meant by that phrasing, to be completely candid, because, of course, the role of guns in society has changed massively since the founding era and the role of having the idea of what it would mean to have someone who committed a serious crime who was not imprisoned. Well, I mean, it distinguished the general societal problems that existed in the 18th century from modern issues that implicate technological changes. So we're not in that technologically modern realm, right? I think there are some differences, of course, that the court could account for in analogizing to the founding era, but I don't think it's necessary to sort of expound upon everything that the court might have meant there, because the standard remains sort of, are these laws similar enough to what the founding era regulations that were in effect and what the founding era views were? And similar enough meaning distinctly similar or relatively similar? I think the key standard is relatively similar in the Supreme Court's decision, and there were reassurances in there that we are not looking for a historical twin, and we are not trying to impose a regulatory straitjacket on what sort of laws legislatures can enact. And here we have just, there is no founding era evidence that founders would have thought that a law disarming people for serious crimes is inconsistent with the preexisting right to their arms. And instead, there is evidence in the other direction in the form of the Pennsylvania report that Heller explained was particularly influential and explained it does not represent sort of an outlier view that the court was relying on that to show that it, in recognizing an explicitly individual right to their arms and spelling out what that right had meant to the entire founding generation, was reflecting what that generation thought. Judge Montgomery-Reese. I want to understand if there are some factual disputes in this case as it relates to Mr. Range. As I understand it, your friend on the other side has stated that, you know, he had a nonviolent offense, that there have only been minor infractions since then, he's been gainfully employed. They point to a number of facts that would suggest that if we're not talking about the welfare fraud offense, he's been a law-abiding citizen. I'd like to know from you, number one, whether you dispute that a number, if you do, what are the facts in the record that suggest if we put the welfare fraud conviction aside, that he's not been a law-abiding citizen since then? I think that the one fact that comes to mind to directly respond to your Honor's question is the fact that he continued to possess firearms after learning that he was disqualified from doing so. But I think what this illustrates is that the inquiry should not and cannot turn on every individual person who's subject to this statute coming into court and getting a court to decide, do I feel that this person is dangerous enough today that I would choose to disarm them? Because the question is whether Congress had the authority to make a categorical judgment that people in this category are not trustworthy enough with firearms, and they moored that judgment in founding era support. Thank you. Judge Frost? Excuse me, Mr. Patterson has acknowledged that Mr. Raines has not identified any firearm that has traveled in interstate commerce either that he's had in the past or that he hopes to obtain in the future. In view of that, does he have standing to bring an action complaining about the applicability of 922g1 to him? We haven't contested Mr. Raines' standing in this case, and I think that there's a footnote in the panel's decision explaining why the panel concluded that he does have standing. Of course, if the court wants further briefing from us on that's something that we can address, but I think we haven't had concerns to date that there is a standing issue in this case. Let me ask another final question. If, for instance, as Mr. Raines has done, a declaratory judgment is brought in the federal court, is the United States Attorney's to come in and defend against the granting of a declaratory judgment concerning whether someone, an individual, has rights or no rights to firearms under the Second Amendment, say, 20 years after a conviction? I think the principle that decides the cases of the conviction is disqualifying under the statute, and that statutory decision by Congress is not entrenched on the Second Amendment, and that's, of course, again, consistent with the results that the D.C. Circuit reached in Medina in analyzing the Texan history, and then the Fourth, Fifth, Tenth, and Eleventh Circuits have all reached following the reassurances in Heller and McDonald, and so I think this court should not take the step of being the first court to make this theory the law. Would that be a burden on the U.S. Attorneys? I apologize. Could you repeat the question? If this court should hypothetically decide that, yes, we will welcome or we will accept a declaratory judgment, would that be a burden on the U.S. Attorneys to come in and defend this type of case? Yes, I think there would be a massive burden on the court system and litigants in the court system in trying to sort out what it means to be dangerous enough in the view of essentially what sounds like the view of the judge looking at the case and looking at the person today without giving any sort of, without recognizing that this is a categorical law and the sort of categorical law that's permissible, and instead having to answer questions like a Plaintiff's reentry, arson, drunk driving are all some of the examples that I think came up in the discussion with him, and having to draw these sorts of lines about is that offense sort of dangerous enough, but also I heard him say, well, maybe sometimes the offense isn't itself dangerous enough, but you can try to show things about the offense conduct, but that's just not the way that this needs to or should work. Thank you. And Judge Ambrose. It would seem that you have an optics problem. A person who is convicted or pleads to taking $2,458 by filing a false application to get to extant to feed his family, you're saying permanently deprives that person of the ability to have a firearm for the rest of his life. That's the judgment Congress made while, of course, recognizing there are restoration procedures available to people, including Mr. Range could seek a pardon. We've mentioned that and they're, they're difficult to do. Is there a middle ground that's justifiable? Is there an historically justifiable middle ground that your plan be? I don't think so. I suppose if the court has not, has decided that there just has to be, I think the court could focus on the nature of the fraud offense. And for the same reasons in the decision in Soledadar about why a felony crime punishable by up to three years that involves locally defrauding the government of tax funds was a sufficiently serious crime to support disarmament of someone, the same rationale could support the felony equivalent crime of five years maximum punishment. That was an issue in this case, being a similar, similar to what you're saying. This, I think, follows up on something that Judge Krause asked. If the Supreme Court tells us that it is presumptively disarming, you're saying from your answer, it sounds like ain't no way he can win. I think that the Supreme Court was providing reassurances that these laws are, that this is the sort of law that's consistent with the Second Amendment. Yes. And, you know, again, if the court is not persuaded by that, I think there are ways of reasoning that tie to the history and that explain why, even if there were some outlier case where someone convicted of a crime that is a felony equivalent that shows grave misjudgment and maladjustment, could be among the crimes for which someone has a Second Amendment right retained, this is not that crime. Thank you, counsel. We'll hear from appellant, and then to rebuttal. Thank you, your honors. Just a few points I'd like to make. First, we heard a lot about serious disrespect for the rule of law, but if we look back to the primary sources, what governments adverted to when they were disarming people was danger. None of the sources ever said serious disrespect for the rule of law. I think we're entitled to free for all now. So I want you to address, if you would, the floodgates argument that this is unworkable. It trenches upon the prerogative of Congress. Courts are going to be flooded. Prosecutors' offices are going to be flooded. It's just not workable, what you're proposing. What's your answer? I think it is workable in the vast majority of cases, crimes that are violent, inherently dangerous, that we can make careful rules of thumb. Those are going to be most of cases that are hard, but then this is a constitutional right. It's a fundamental constitutional right that we're talking about. How's that to be handled? Just as a matter of procedure, lay out how you perceive this would be managed. Anybody who had a felony conviction, in your view, could now do what? Come to court with an application and say, yeah, I did rob a bank, but I've been good for the last five years, and I'm not dangerous anymore. Yes, they could come with that application. Anybody could come? Yes, anybody could. The court would have to decide it. The government would have all the tools of civil discovery that are available, subpoenas, depositions, discovery requests, and they could show that, no, that person is, in fact, is still dangerous. And you think the system is geared to handle that? I think that the system, as the Bindrup dissenter said every day, courts decide bail hearings. They do. They decide things of that nature. They decide bail hearings when the government goes out and gets somebody, and the government hauls them in, and the government chooses to prosecute. But what you're proposing is that for the thousands, tens of thousands, hundreds of thousands of potential applicants who are felons, that they're free to come, and they're free to get to court to do that, and they're free to make the prosecutor's office respond to that. That's the position that you've got, right? Yes, and I don't think it's necessary... There's no limiting principle to what... I don't think it's necessary to decide this case, because our position in this case is the offense itself. Well, and who mandates that? The second amendment mandates that, because it gives people a fundamental individual right. And as the Supreme Court said in the Miller case, it would be inconsistent with our duty to uphold the constitutional guarantees to not face up to the tough individual problems of constitutional judgment involved in every obscenity case. That was an obscenity case. The courts are here to adjudicate our constitutional rights, and if it's hard, if this line is not administrable, as I said, then it's facially unconstitutional. We don't have prophylactic rules that under-protect constitutional rights. A few other... Does your assertion that there's no historical disarmament for offenses like forgery or procurement fraud or embezzlement, does that require that we ignore all of the forfeiture laws that resulted in forfeiture of an estate, including firearms? No, I think a lot of that didn't travel to America, as I think there was a question indicating that for federal criminal laws at the founding that didn't result in anything. Forfeiture is not the same as permanent disarmament. Here, Mr. Raines is not saying he needs to be able to have a firearm that he had at one point. He wants to get a new one, and forfeiture would not have prevented that. In terms of whether as-applied challenges are available after Bruin, Bruin actually proves that they are, because in that case, the court reframed the question presented as whether denial of petitioner's applications violated their rights, and in footnote 8, the court addressed New York's argument that while some licensing officials administer this law in a more shall-issue type of manner, and the court said that doesn't matter because they didn't do that with respect to these two people. And so, Bruin itself shows that an as-applied challenge is available. You're really towing the danger line hard. I get it. I guess my question is, when we look at danger under your conception, are we supposed to look at the crime itself, its elements, and maybe some facts as to how it was committed, or are we supposed to look more at the individual and how the law applies to them, and whether the evidence of that prior crime gives us some sense of imminent danger? The crime itself. That is the basis upon which the disarmament is based. So, you have to look, is what the law bases the disarmament on? So, what you're saying is that as long as the person committed a crime that itself triggered all of the danger items, then they lived infraction-free for 60 years, you would say, no, there might not be any imminent danger, but that perpetual disarmament is fine under your position as well? Well, we're saying there are two distinct questions. One is the offense itself disarmament, and then there could be a second question. Could a person, even if the answer to that is yes, then bring an as-applied challenge? And so, I would say for that person, then yes, that person could bring an as-applied challenge, but the offense itself would be legitimately disarmed. But it seems if they have an as-applied challenge, you're baking in a little imminence, not just the prior crime. You're looking at that person's current circumstances and what that prior crime may tell you about their current situation. Is that right? Isn't imminence just baked in, is what I'm getting at? In that as-applied scenario, yes, Your Honor, but not in the initial determination. And if I could wrap up, I don't know if I have time, I wanted to correct one thing. Yes. So, with respect to whether Range is violent, at 117 of the appendix, the government admitted Range has never engaged in violence, nor has he ever threatened anyone with violence, and he never possessed firearms after learning that he was disqualified. As soon as he found out that was the case, he got rid of the firearm that he had. Thank you. Thank you, counsel. We thank all counsel for their excellent argument, both oral and written. We'll take the case under advisement, and it's a very interesting case. Well done. Thank you.